Jones, Chief Judge,
delivered the opinion of the court:
Plaintiff seeks to recover monies which it alleges are due under, certain contracts with the defendant. The parties have stipulated that defendant owes plaintiff $43,181.13 and that plaintiff owes defendant $8,497.76 under these contracts. The agreed net indebtedness in favor of the plaintiff therefore amounts to $34,683.37. Against this amount the defend *404 ant pleads ■ a counterclaim which, if sustained, has been stipulated to be $109,128.70. In this counterclaim defendant seeks to recover certain dividends which plaintiff received under a workmen’s compensation insurance policy and which defendant alleges were paid to plaintiff after defendant had reimbursed plaintiff for the amount of the original premiums.
Plaintiff is a California corporation, sometimes engaged in the ship repair business, which, on or about September 15, 1943, entered into three master ship repair contracts with different agencies of the defendant. These contracts were War Department No. W30-l79tc-188, Navy Department No. NOBS-10185, and War Shipping Administration No. WSA-^ 6045. The stipulated indebtedness of .$34,683.37 arises out of the Navy and War Shipping Administration contracts only. Except for the different Government agencies, each of these contracts contains the same original provisions and the same amendments. Certain detailed provisions of the common contract are quoted in the findings of fact. In general outline the contract provided as follows:
The contractor undertook to make repairs and alterations on vessels ordered to its plant for this purpose. Article 5 of the contract (together with minor provisions of other articles) set forth how plaintiff was to be compensated. Plaintiff was to receive a specified amount for each hour of “Payable Hours of Direct Labor.” The contract defined the latter term as the sum of the quotients obtained by dividing the total wages of workmen performing direct labor on the work by their respective wage rates. The amount which the original contract specified for each hour of payable hours of direct labor was revised from time to time by supplemental agreements negotiated between the parties. Section (d) of Article 5 provided for further negotiation of this amount at the instance of either party after the quarterly cost reports on operations under the contracts had been submitted to the Government; Should the parties be unable to agree the contract contemplated unilateral determination by the head of the agency.' The amount for each hour of payable hours of direct labor is called the billing rate.
*405 Article 5 also allowed plaintiff payment for the cost of its materials utilized directly on the work and for certain tools and facilities rented or furnished to the contractor in connection with the work. It authorized compensation for the cost of increased wages and related expenses resulting from retroactive mandatory orders of the War Labor Board. Under section (b) of Article 5 either party could request renegotiation of the price billed for work during a particular quarter or on an individual vessel under the •contract, and, in the event the parties could not reach an understanding, the agency was to decide the question unilaterally.
The facts show that while the supplemental agreements as to the billing rate resulted from bargaining, the parties gave great consideration to plaintiff’s actual cost factors in determining this amount. Finding 5 indicates the accounting procedures that were followed in formulating the applicable rates. The usual practice was to compute a rate on the basis of quarterly reports of costs incurred by the plaintiff in the execution of the contracts. This rate was then used in computing compensation to be paid for the ■quarter commencing one month after the end of the quarter for which cost computation had been made. As the plaintiff has pointed out, this method of payment had the effect of .giving compensation for one period on the basis of costs from another, earlier period.
During the time the contractor was carrying out its master .ship repair contracts, it carried workmen’s compensation insurance with the Industrial Indemnity Exchange. Plaintiff’s policies were participating policies under which it would be entitled to certain dividends from the surplus accruing to the carrier when the carrier’s receipts exceeded its losses. The carrier divided this fund among the firms it insured according to a formula which favored those participants with the best safety record. While plaintiff’s safety record during the first two years of its policies was such that it received no dividends, during 1944 and 1945 plaintiff’s safety record greatly improved and it was paid large dividends for those periods.
*406 Plaintiff did not receive the first of these dividend payments until near the end of its contracts with the Government, the other dividends not until long after the completion of the contracts. Since the contracts provided for substantially current payment, whatever costs for workmen’s compensation insurance had been considered in fixing plaintiff’s compensation did not take into account the dividends which plaintiff later received on its policies. The evidence does not allow any determination as to whether plaintiff' recovered from the Government all workmen’s compensation insurance costs that were properly allocable to the ship repair-contracts. Nevertheless, it permits the inference that the cost factors that were considered in negotiating the billing-rate included certain amounts for workmen’s compensation insurance. The parties have agreed that one hundred and seven-one hundredths of $109,128.70 is the amount of the-insurance dividends properly allocable to the three mastership repair contracts.
Defendant bases its right to recover on the following sentence in section (e) of Article 5 of the contract:
If the Contractor, after having been reimbursed,, either directly or indirectly, by the Government for any item of services, material or overhead, subsequently receives any additional sum as a discount, rebate, allowance, credit, salvage or commission in respect of any such item, the Contractor shall promptly pay to the Government an amount equal to eleven-tenths (11/10) of such additional sum.
Plaintiff contends that it does not fall within the strictures-of this clause: first, because it was not “reimbursed” by the-Government; and second, because a dividend on a workmen’s compensation insurance policy is not an additional sum received as a “discount, rebate, allowance, credit, salvage or commission in respect of any” item of “services, material or overhead”.
Before its argument on the merits, plaintiff raises several procedural objections addressed to defects in the pleadings. The Government pleaded in its counterclaim that “plaintiff is further obligated to pay to defendant under the provisions of Article 5 (e) of the contract, a copy of which is attached hereto as Exhibit ‘D’, the sum of $112,472.93 rep *407 resenting sums received by the plaintiff from its insurance companies as reimbursement on premiums paid by plaintiff for Workmen’s Compensation insurance on employees working under the contract”. An earlier paragraph of defendant’s pleading had made reference to “both Navy Department Contract No. NOBS-10185 and War Shipping. Administration Contract No. WSA-6045, hereinafter referred to as ‘the contracts’ ”, but did not refer to the third contract. Plaintiff first argues that the Government has not pleaded its rights under the third contract, the War Department contract, and is, therefore, precluded from recovering that much of its claim under the pleadings. Defendant’s counterclaim does not allege a claim under the War Department contract nor does it allege that defendant is entitled to any of the workmen’s compensation insurance dividends allocable to that contract. We think that defendant has not pleaded a counterclaim to the War Department contract. It is precluded from recovering on its counterclaim to that extent. Standard-Vacuum Oil Oo. v. United States, 339 U. S. 157; Werfel et al v. United States et al, 83 F. Supp. 507; Lilly v. United States Lines Co., 42 F. Supp. 214.
Defendant pleaded in its counterclaim that plaintiff was obligated to repay “under the provisions of Article 5 (e) of the contracts, a copy of which is attached hereto as Exhibit ‘D’ ”. Plaintiff’s second procedural argument relies on the fact that Exhibit D does not contain the last sentence of Article 5 (e), which is the sentence quoted two paragraphs above and the very sentence upon which defendant predicates its right to recover. That sentence came into the contract by amendment to the contract to which plaintiff agreed.
The plaintiff asserts that the Government’s pleadings are incomplete, but we think they are sufficient to cover the Government’s theory of recovery, and that plaintiff has not been surprised or prejudiced. There is no contradiction between the exhibit and the pleadings. Exhibit D was identified in the counterclaim as Article 5 (e) of the contract, but stars indicated that the section was not quoted in full. The question raised is not whether the defendant relied on Article 5 (e) or what were the terms of Article 5 (e), but *408 what parts of it defendant was relying on. As to the latter question plaintiff could not have been misled. As early as 1947 plaintiff had written to defendant in regard to the controversy in suit here. Plaintiff there quoted the disputed part of Article 5 (e). It said that it understood the Government was relying on it. Plaintiff maintained that the quoted sentence did not warrant the Government’s claim. Under the circumstances plaintiff had no right to construe the pleadings as narrowly as it did and it cannot now, at this late stage of the proceedings, make a justifiable claim of having been misled as to the true nature of the Government’s claim.
On the first part of plaintiff’s argument on the merits, we think that plaintiff has been “reimbursed either directly or indirectly”, within the meaning of the contract. Plaintiff contends that to reimburse means to repay an equivalent, citing Webster’s definition.[1] It argues that section (e) applies only to savings in the cost of direct materials or other items for which plaintiff was compensated directly. It says that it never was given an equivalent to what it expended on the insurance premiums; that these premiums were merely considered in fixing the billing rate and there is no proof that they were, in fact, recovered in the compensation received from the Government. It is also contended, in the alternative, that had the accounting system used in connection with negotiating the billing rate been one of cost reimbursement, the contract would have been an illegal cost plus a percentage of cost contract since that accounting system also included a profit factor based on a percentage of costs.
Even though the Government was under no obligation to repay all of plaintiff’s costs plus a percentage for profit, the compensation that plaintiff did receive was closely correlated to its costs. Plaintiff had made an offer of proof to show that not all its costs had been considered in fixing the billing rate and that consequently it had not been fully re *409 imbursed. This is beside the mark in connection with the application of Article-5 (e) since, as plaintiff points out, the billing rate did not contemplate a literal, dollar-for-dollar reimbursement of all of plaintiff’s costs. It is sufficient that we know that the premiums had been considered in fixing plaintiff’s compensation. ■ Thereupon the contract under section (e) of Article 5 gives us a formula for adjustment. This formula provides for the return by plaintiff of one hundred and seven-one hundredths of any reductions allo-cable to the ship repair contracts which plaintiff may receive after having been compensated.
The first part of section (e) required the plaintiff to take cash and trade discounts, etc. We do not think it probable that the contract intended plaintiff to make these savings only in those cost items for which plaintiff was to receive direct compensation but not in those items which were merely considered in arriving at a billing rate. Since we cannot agree with plaintiff’s narrow construction of the first part of section (e),we must also disagree with its conclusion that the last clause of section (e) must be given the same narrow range of effect. The all-embracing character of the duty to minimize costs under Article 5 (e) is illustrated by the language of that part of the contract. The first sentence .of section (e) speaks of “all cash and trade discounts, * * the second sentence says “materials and services of every kind required for the performance of this contract”. This conclusion receives further support in the last sentence where it speaks of “any item of services, material or overhead”.
Section (e) as originally written stipulated that the contractor should take advantage of all cash or trade discounts, etc., and that it would be charged as though it had taken advantage of them if it culpably failed to do so. The added portion of section (e) requires that plaintiff should pay one hundred and seven-one hundredths of any sum it receives as a discount, etc., on any item for which it has been reimbursed by the Government.
Plaintiff’s second main argument maintains that when it received the dividends on its workmen’s compensation insurance policies it did not receive an additional sum as a *410 discount, rebate, allowance, credit, salvage, or commission. Plaintiff thinks that fixed or presently obtainable discounts, etc., were intended by these words; that such discounts, etc., are conditioned on wholly formal and ministerial requirements, whereas the insurance dividends depended on an uncertain event in the future, namely, plaintiff’s safety record. As such, plaintiff contends, the dividends were payments in the nature of a reward for plaintiff’s managerial skill in reducing accidents.
The terms discount, rebate, allowance, credit, salvage, or commission clearly cover the refund on insurance premiums. These words suggest a general concept, such as any subsequent reduction in a cost item. This broader category would include payments of dividends of the kind here received by the plaintiff.
Plaintiff is entitled to recover the stipulated amount of $84,683.37. On the controverted counterclaim defendant is entitled to recover $89,542.22. This represents $109,128.70 minus one hundred and seven-one hundredths of the amount allocable to the War Department contract — that is, minus $19,586.48. Defendant is, therefore, entitled to recover the net amount of $54,858.85, with interest at the rate of 4 percent per annum from the date of the filing of defendant’s counterclaim, to wit, March 7, 1952, to date of payment.
It is so ordered.
Laramore, Judge; Madden, Judge; Whitaker, Judge; and Littleton, Judge, concur.
FINDINGS OP FACT
The court, having considered the evidence, the report of Commissioner Koald A. Hogenson, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is a California corporation, sometimes engaged in the ship repair business, which on or about September 15, 1943, entered into three master ship repair contracts with different agencies of the defendant. These contracts were War Department No. W30-l79tc-188, Navy Department No. NObs-10185, and War Shipping Administration No. WSA-6045. Except for the different government *411 agencies, each of these contracts contains the same original provisions and the same amendments.
2. The pertinent parts of these contracts, as amended, are as follows:
ARTICLE 1. — PURPOSE
The purpose of this contract is to establish the terms upon which the Contractor will provide berthing, dry-docking, marine railway, shipyard, and other facilities together with materials and services. for effecting expeditious repairs, completion, alterations of and additions to Naval vessels of the Government and other nations and merchant vessels of United States and other registry and portions thereof which may be ordered to the Contractor’s plant or another location for the performance of work hereunder from time to time during the period of this contract.
ARTICLE 5.-COMPENSATION
(a) The Contractor shall be paid for work done under all job orders hereunder amounts accepted by the Naval Cost Inspector as follows:
(i) At the rate of $1.87 [thereafter revised] for each hour of Payable Hours of Direct Labor. “Payable Hours of Direct Labor” is defined for the purpose of this contract as: The sum of the quotients obtained by dividing the total wages of workmen performing direct labor on the work by their respective wage rates. If the Contractor consistently does so for all purposes of this contract, it may, at its option, include shift work and dirty work premiums and allowances for lunch periods as a portion of the wage rates; otherwise, wage rates shall be first shift straight time rates. Total wages •shall include but not be limited to straight time, overtime, shift work, allowances for lunch periods and rest periods required by law, traveling time, dirty work premiums and incentive bonuses. Direct labor shall be labor performed by the Contractor’s employees directly upon and properly chargeable directly to the work; foremen (including leading men, snappers, ■quartermen, etc.) shall be considered as direct laborers if the Contractor consistently classifies in its accounting -system the wages of the foremen with the wages of direct labor but otherwise the wages of foremen shall be included with indirect expenses.
When wage scale rates on new construction work, as ■defined in the applicable Zone Standard Agreements, *412 apply to work under this contract, the billing rate above set forth, or as hereafter agreed, shall be reduced by the difference between the hourly straight time wage scale'of'first-class mechanics on repair work and the same wage scale on new construction work as contained in the applicable Zone Standard Agreement.
(ii)..The amount of each subcontract hereunder made with the approval of the Naval Inspector as required by Article 10 hereof (except subcontracts for temporary facilities, tools and equipment and services in connection therewith) and of the Contractor’s Cost of Direct Materials (as hereinafter defined). The “Contractor’s Cost of Direct Materials” is defined as: The net purchase price, including but not limited to transportation charges and sales and excise taxes which the Contractor is required to pay, of all purchased materials and fabricated parts entering directly into the work or which are used directly in fabricating or processing such materials and parts and all items directly charegable to the work not otherwise chargeable under the provisions of this paragraph, (a), provided said charges are approved by the Naval Cost Inspector; but not including the amount of any subcontract charged hereunder. Purchases made specifically for the work will be taken at their net purchase prices as provided in paragraph (e) of this Article 5. To the extent that any division or affiliate of the Contractor shall furnish any materials, supplies or equipment hereunder which in the industry are usually procured from others in performing a ship repair, completion, alteration or addition contract, the cost, for the purposes of this paragraph, of such materials, supplies or equipment may be equal to but not in excess of the prevailing market prices. Withdrawals from regular stores or stock rooms will be taken at their cost under any recognized method of pricing stores withdrawals conforming to sound accounting practices and consistently followed. Material cost will include only the cost of materials required to be used for the work.. Direct materials will include consumable supplies such as cleaning material, template material and pattern stock,, used directly in connection with the work although not permanently incorporated therein.
(iii) Charges for use of temporary facilities, tools and equipment and services in connection therewith hired from third persons for the performance of any part of the work with the approval of and at rates-of hire approved by the Naval Inspector, as required by Article 10 hereof;
*413 (iv) For drydock, marine railway, floating derrick, and tugboat services furnished at rates specified in Schedule“A” attached hereto, if such rates are provided in a Schedule “A” hereto;
■ (v) For electricity, steam, fresh water, compressed air, and flushing water furnished to a vessel, at rates approved by the Naval Cost Inspector;
(vi) The increase in wages and related tax and insurance costs paid for work done under this contract as a direct result of a retroactive mandatory order of the War Labor Board, but without allowance for either profit or overhead.
(b) Anything in this contract to the contrary notwithstanding, the Contracting Officer may require the Contractor to enter into negotiations with the Contracting Officer for the purpose of agreeing upon a price .as in this paragraph (b) provided.
(i) Upon notice in writing from either the Contracting Officer or the Contractor to the other within sixty (60) days after the end of each calendar quarter, or within sixty (60) days after the end of any shorter fiscal period, or within sixty (60) days after completion and billing for all work on an individual vessel, the Contracting Officer and the Contractor shall negotiate to determine the price to be paid for work billed during such quarter or shorter time or on such vessel as provided in such notice. When an agreement is reached as to the price to be paid, it shall be set forth- in a written supplemental agreement.
(ii) If, within thirty (30) days after commencing such negotiations, no agreement has been reached re-farding the price, the question may be' submitted for nal determination to the Secretary of the Navy by the Contractor or by the Contracting Officer. A Board composed of one representative each of the Secretary of the Navy, the Secretary of War and the Administrator, War Shipping Administration, after considering any matters which may be presented to it by the Contractor as hereinafter provided, shall make its recommendations regarding the question to the Secretary of the Navy. The Contractor may, if he so desires, within ten (10) days from and after the date on which the Contractor submits the question to the Secretary of the Navy, or from and after the date the Contractor receives notice that the Contracting Officer has submitted the question to the Secretary of the Navy, present in writing to such Board any facts or circumstances which may, in the Contractor’s opinion, have a bearing upon the price to *414 be determined. After considering the recommendar tions of the Board, the Secretary of the Navy shall determine the price to be paid, and his determination shall be final and conclusive.
* at * * #
(d) The rate for Payable Hours of Direct Labor in paragraph (a) (i) of this Article 5 shall be subject to revision as follows:
Within forty-five (45) days after the end of each calendar quarter during the existence of this contract, the Contractor shall submit to the Contracting Officer:
(i) A report of the total number of Payable Hours of Direct Labor (computed in the manner provided for computing Payable Hours of Direct Labor in paragraph (a) (i) of this Article 5) for all repair, completion, alteration and addition work, whether under this contract or otherwise, performed by the Contractor at the plant or at another location for the performance of the work hereunder, during the preceding quarter, and the total amount of wages (including straight time, overtime, shift work, allowances for lunch periods and rest periods required by law, traveling time, dirty work premiums and incentive bonuses) paid therefor. Also a report of the total wages paid for direct labor for work by the plant other than repair, completion, alteration and addition work;
(ii) A report of the indirect expenses of the Contractor’s entire plant for the preceding quarter classified in reasonable detail in accordance with the Contractor’s accounting system. Such indirect expenses shall comprise all expenses of the Contractor, except the cost of materials and services for which charges are made under subparagraphs (i), (ii) and (iii) of paragraph (a) of this Article 5, paragraph (c) of Article 9, Article 12 and Article 22 hereof and all costs directly applicable to work not under this contract, subject to the limitations and exclusions described in paragraphs 43 through 46, 48 through 52 and paragraph 54 of the pamphlet “Explanation of Principles for Determination of Costs under Government Contracts” printed by the U. S. Government Printing Office, April 1942;
(iii) A report of the total amounts charged by the Contractor under this contract or otherwise, for use in the preceding quarter of facilities of the kind mentioned m paragraph (a) (iv) above and facilities and supplies of, the kind' mentioned in paragraph (a) (v) above, showing separately, the total of such amounts *415 charged-to the Government and all of its agencies and. the total of such amounts charged to others;
(iv) Reports setting forth such additional information pertaining to this contract as may be required by the Contracting Officer.
Such reports shall be certified by two officers or other responsible officials of the Contractor, one of whom shall be a person supervising accounting with respect to this contract, and shall be deemed to be representations made by the Contractor to the Government for the purpose of inducing the payment of funds to it.
Upon the basis of the information contained in such reports and any other available information, the parties, upon the request of either, agree to negotiate in good faith to determine a revised rate per Payable Hour of Direct Labor for purposes of paragraph (a) of this Article 5, such revised rate to be effective from a date not earlier than the end of the preceding quarter, agreed upon by the parties, and the terms of such agreement shall be incorporated in an amendment to this contract. But if the parties fail to agree within seventy-five (75) days after the end of the preceding quarter, the revised rate for the applicable quarter shall be determined by the Secretary of the Navy after consideration of the recommendation of a Board composed of one representative each of the Secretary of War, the Secretary of the Navy and the Administrator, War Shipping Administration; such revised rate shall be incorporated promptly in an amendment to this contract.
In determining the amount of the Contractor’s indirect expense there shall be deducted one hundred-one hundred and sevenths (100/107) of an amount equal to all charges by the Contractor under Government contracts for the repair and alteration of vessels of the nature described in paragraph (a) (iv) of this Article 5, less all rentals paid to the Government on drydock and marine railway facilities under a Navy Department facilities contract or on waterfront facilities under a Maritime Commission or War Shipping Administration contract or lease, and one hundred-one hundred and sevenths (100/107) of all charges by the Contractor under Government contracts for the repair and alteration of vessels of the nature described in paragraph (a) (v) of this Article 5. There shall also be deducted seven-one hundred and sevenths (7/107) of all moneys paid by the Contractor to the Government or any of its agencies for premiums of policies of insurance covering any risk, hazard or liability of the Contractor arising *416 out of or in connection with this contract and an amount equal to seven-one hundred and sevenths (7/107.) of all moneys paid by the Contractor to the Government and ..allocable to this contract for rental of facilities other than drydocks and marine railways under a Navy Department facilitiés contract, or waterfront facilities under a Maritime Commission or War Shipping Administration contract or lease.
(e) The Contractor will, by tax exemption certificates or otherwise, eliminate all taxes on material purchased for work hereunder to the extent practicable, and will to the extent of its ability, take all cash and trade discounts, rebates, allowances, credits, salvage, and commissions, and when unable to take advantage of such benefits it shall promptly notify the Naval Cost Inspector to that effect and the reason therefor. In determining the net cost of materials and services of every kind required for the performance of this contract, there shall be deducted from the gross cost thereof all such benefits which have accrued to the Contractor or which would, except for the fault or neglect of the Contractor, have so accrued; but such benefits lost without fault or neglect on the part of the Contractor, or lost because of the fault of the Government, including failure to pay the Contractor within the time required by this contract, shall not be deducted from such gross cost. If the Contractor, after having been reimbursed, either directly or indirectly, by the Government for any item of services, material or overhead, subsequently receives any additional sum as a discount, rebate, allowance, credit, salvage or commission in respect of any such item, the Contractor shall promptly pay to the Government an amount equal to one hundred and seven-one hundredths (107/100) of such additional sum.
*****
ARTICLE 9.-PLANS, SPECIFICATIONS AND MANNER OF DOING WORK
*****
(d) No welder shall be permitted on work in connection with repairs, completion, alterations or additions unless his qualifications satisfy the Naval Inspector and he is certified by the Bureau of Marine Inspection and Navigation, or American Bureau of Shipping, or he has passed the Navy test for welders. Likewise, welding electrodes and welding technique used shall be satisfactory to the Naval Inspector. All welding on boilers and high pressure steam lines shall be in accord- *417 anee with the rules of the Bureau of Marine Inspection and Navigation.
(e) The Contractor shall exercise reasonable care to protect the vessel from fire under the prevailing circumstances. To this end the Contractor shall maintain a reasonable system of inspection over the activities of welders, burners, riveters, painters, plumbers and similar workers, particularly where such activities are undertaken in the vicinity of the vessel’s magazines, fuel oil tanks or storerooms containing inflammable materials. Hose lines shall be maintained in such number and as required by the Naval Inspector between the vessel and the shore ready for immediate use at all times while the vessel is berthed alongside the Contractor’s pier or in dry dock or on marine railway. All tanks imder alteration or repair shall be cleaned, washed and steamed out by the Contractor as may be necessary and the Naval Inspector shall be furnished with a gas-free certificate before any work is done on a tank. The Contractor shall maintain a fire watch on the vessel at all times which shall be satisfactory to the Naval Inspector.
(f) The Contractor shall place proper safeguards for the prevention of accidents, and shall put up and keep at night suitable and sufficient lights where necessary during the prosecution of the work and use its best efforts to prevent accidents or injury to persons or property.
❖ * ifc * ❖
ARTICLE 18.-WORKMEN’S COMPENSATION INSURANCE
During the life of this contract the Contractor will provide and maintain, for all employees of the Contractor engaged in work under this contract, such Workmen’s Compensation Insurance or such other protection for employees as may be required by Federal or State statutes in the jurisdiction in which such work is performed, under the direction of the Contracting Officer.
* Si! * * *
ARTICLE 28.-DISPUTES
Except as otherwise specifically provided in this contract, all disputes concerning questions of fact which may arise under this contract or on any job order, or plans or specifications, and which are not disposed of by mutual agreement, shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail a copy thereof to the Contractor by registered mail. Within thirty (30) days from said mailing the Contrac *418 tor may appeal to the Secretary of the Navy, whose decision or that of his duly designated representative, or representatives, or board shall be final and conclusive upon the parties hereto. No claim by the Contractor arising under this contract with respect to any vessel shall be considered unless submitted in writing within six (6) months from the date of completion of the repairs and alterations on such vessels or her equipment by the Contractor, or within such longer period as the Secretary of the Navy may approve in writing. Pending decision of a dispute hereunder the Contractor shall diligently proceed with the performance of this contract.
3. It has been stipulated by the parties that the plaintiff is owed by the defendant the sum of $43,181.13 for work and services performed under the Navy Department and War Shipping Administration contracts.
It has been further stipulated that the plaintiff is indebted to the defendant under these two contracts in the sum of $8,497.76, representing that part of increased wages which plaintiff was obligated to pay to its employees pursuant to orders and decisions of the National War Labor Board, which the plaintiff could not pay because of inability to ascertain the whereabouts of the employees entitled thereto.
Aside from the defendant’s counterclaim for certain credits received by the plaintiff on its workmen’s compensation insurance policies, the defendant admittedly owes the plaintiff the sum of $34,683.37.
4. Pursuant to Article 5 (d) of the contracts, the rate for each hour of payable hours of direct labor which commenced at $1’.87 was revised quarterly throughout the life of the contracts, as follows:
To Be Applied On work Per-Based Upon Ac- By Supple- formed Under Contracts For counting Informa- mentary Periods tion For Quarter Agreement - - Ended Revised Rate Dated From To
9-30-43 $1. 93 12-21-43 11-1-43 1-31-44
12-31-43 1. 966 2-25-44 2-1-44 4^-30-44
3-31-44 1. 88 5-10-44 5-1-44 7-31-44
6-30-44 1. 90 8-25-44 8-1-44 10-31-44
9-30-44 1. 96 11-1-44 11-1-44 1-31-45
12-31-44 1. 87 2-6-45 2-1-45 4r-30-45
3-31-45 2. 03 4-26-45 5-1-45 7-31-45
6-30-45 1. 90 8-1-45 8-1-45 10-31-45
9-30-45 2. 17 11-1-45 11-1-45 1-31-46
(waived) 2. 17 2-1-46 2-1-46 4r-30-46
*419 At first the billing rate was revised after a Government audit of the plaintiff’s records for the preceding quarter. Commencing June 30, 1944, the plaintiff prepared its own rate proposal, and the Government then proceeded with an audit. Each revised rate and its effective date were formalized by the execution by the parties of supplementary agreements to the contracts, the most recent of which was dated February 1, 1946. The Army and War Shipping Administration contracts were duly terminated in October 1945. Wort continued on the Navy contract until April 1946. The plaintiff’s petition was filed in this court July 23,1951.
5. The revised rate for each hour of payable hours of direct labor was determined from the plaintiff’s accounting records for the preceding quarter in the following manner:
(1) To compute an amount for the basic labor rate per payable hours, the direct labor cost of all ship repair and alteration work performed by plaintiff during the previous quarter, including work performed under contracts with the defendant and with third parties, was divided by the total number of direct labor hours expended by plaintiff during the previous quarter in all such ship repair and alteration work.
(2) To arrive at a rate for indirect expenses per payable hour, the following steps were taken:
(a) The total of the allowed indirect expenses of plaintiff during the previous quarter on all of its work was divided by the total number of straight time direct labor hours expended by plaintiff during the previous quarter on all work.
(b) To allocate the indirect expenses on all work to all repair and alteration work, the quotient, determined as described in the preceding subparagraph, was then multiplied by the total number of straight time direct labor hours expended by plaintiff during the previous quarter on all ship repair and alteration work, whether under contracts with the defendant or with third parties.
(c) The product, determined as described in the preceding subparagraph and termed “indirect expenses allocated to all repair and alteration work”, was then divided by the direct labor cost on all ship and alteration work, and the *420 resulting figure was the “ratio of overhead expenses to direct labor cost” of performing all repair and alteration work.
(d) The ratio, determined as described in the preceding paragraph, was then applied to the basic labor rate per payable hour, determined as described in paragraph (1), to arrive at a rate of indirect expenses per payable hour under the pertinent contracts.
(3) The indirect expenses per payable hour, determined as described in paragraph (2), was then added to the basic labor rate per payable hour, determined as described in paragraph (1).
(4) The sum determined as described in paragraph (3) was then increased by a profit factor obtained by multiplying said sum by the profit percentage allowed under the terms of the contracts.
(5) The sum determined as described in paragraph (4) was then increased by a factor term “allowance for handling material”, which was based on the plaintiff’s cost of direct materials under the contracts.
(6) The sum determined as described in the preceding paragraph (5) became the revised rate for each hour of payable hours of. direct labor effective for a three-month period as indicated in the table in finding 4.
6. Plaintiff never filed any written protests against the billing rates as established by the supplementary agreements, nor did plaintiff take any administrative appeal from any of the billing rates so established, either under the contract or otherwise. The plaintiff by its officers and the defendant by its contracting officer signed each supplementary agreement.
7. The premiums paid by the plaintiff on its workmen’s compensation insurance policies were one of the indirect costs included in the computation of the billing rate. Some workmen’s compensation premiums would occasionally be excluded in the computation of the billing rate, but only such premiums as had been paid in a later quarter and were included as indirect costs in the earlier quarter upon which the billing rate was being computed. These misplaced premiums would then be eliminated from the cost data used in the *421 computation of tbe billing rate, but would then be included as cost data in the computation of the next billing rate. In the end, all workmen’s compensation insurance premiums al-locable to Government contract work were included in the indirect costs used in computing the quarterly billing rates.
8. It has been stipulated by the parties that plaintiff had three workmen’s compensation insurance policies on which aggregate premiums were paid in the amount of $263,295.45; and that dividends totaling $133,447.09 were received by the plaintiff on these policies. An amount 107/100 of which is $109,128.70 is applicable to the three contracts involved in this case, allocated, after the application of the factor 107/100, as follows:
Amount of Dividend Contract Received
Navy Department No. NObs-10185- $66,025.94
War Department No. W30-179te-188_ 19,586.48
War Shipping Administration No. WSA-6045_ 23,516.28
$109,128.70
9. Plaintiff’s workmen’s compensation insurance policies were what is known as participating type policies wherein the insuring company distributes to its policyholders a dividend based upon the insuring company’s net surplus at the year’s end. The dividend distribution is not guaranteed, but is instead paid in accordance with a published dividend scale when the insuring company makes a profit on policies issued. Not all insured companies, however, participate in dividend distributions, and generally the extent to which an insured company receives a dividend, when one is paid, is based upon the insured company’s safety-record, and upon the ratio between premiums paid in and loss payments paid out. The insuring company, under the participating type of insurance policy, first adds the total amount of premiums collected from all the participating companies for a particular year. From that sum there is deducted the total losses from injuries incurred in all the participating insured companies. Then there is deducted management and operating costs of the insuring company. There is then left a net surplus to the insurance company. The dividend payable to each of the insured companies from this net surplus is then determined by *422 applying a dividend scale which, takes into account the losses accruing during the year for each insured company. Thus the participating company which has had a good safety record will receive more in the way of a dividend than a participating company which has had a poor injury record for the year. Each insured company would receive its dividend based upon its own injury record and loss-to'-premium ratio; and the ratios of other insured companies, or the average ratio of all insured companies would not be considered. Further, it was possible under this system for an insured company to pay substantial premiums and still receive no dividends because of a poor injury record. It was not possible under the participating type policy, however, for plaintiff to be levied with an assessment in addition to its premiums in a poor injury record year when losses paid out exceeded premiums paid in. Plaintiff’s safety record during the first two years of its policies was such that it received no dividends, but during 1944 and 1945 plaintiff’s safety record was very good, its loss ratio very low, and it received large dividends.
10. Plaintiff’s workmen’s compensation insurance policies were placed with a concern called the Industrial Indemnity Exchange. The provisions of the policies establishing plaintiff’s relation to the Industrial Indemnity Exchange, and the savings or dividend program under the policy were as follows:
M. Subscribers relation to exchange. Subscribers at the Industrial Indemnity Exchange, herein also called “Exchange”, are individuals, firms, and corpora^ tions which have executed an agreement (hereby made a part hereof) which vests in the Industrial Underwriters, herein called “attorney”, power to issue this Policy for them. It is understood and agreed that the indemnity granted by each participating subscriber, as if a separate Policy were issued therefor, shall be that proportion of the aggregate indemnity granted hereunder that such employer’s premium deposits bear to the aggregate of all premium deposits under Policies issued in the same calendar year; provided, that the foregoing provision shall not limit or affect the authority of the Advisory Committee to adopt dividend schedules which classify subscribers according to individual premium volume and loss ratio and to authorize distri *423 bution of savings in accordance with such, schedules. Whenever the word “Policy” occurs herein it means, and shall be taken and construed to mean this Policy in its entirety, which is issued to' the Employer named herein in exchange for, and in consideration of, indemnity extended by him to other subscribers.
N. Savings. This Policy is a participating policy and savings shall be credited and returned to this Employer as authorized by the Advisory Committee of the Exchange, provided that no dividends shall accrue or be payable hereunder, unless specially approved by the Advisory Committee: (1) If any part of the premium for this Policy shall remain unpaid after written demand therefor, or in any event for a continuous period of ninety days following date of mailing the Exchange’s statement therefor to this Employer at the address appearing on the records of the Exchange, or (2) If the payroll records of this Employer are not available for audit or not in such condition that the actual premium for the Policy Period can be ascertained by payroll audit, or (3) If suit is brought by the Exchange for an accounting or to enforce collection of any part of the premium for this Policy. In no event shall that part of any dividend accrue or become payable which would operate to reduce the total net premium to be retained by the Exchange for this Policy to an amount less than the minimum premium.
11. On July 12,1946, the defendant’s Officer-in-Charge of plaintiff’s contracts wrote plaintiff concerning payment to the Government, under the provisions of Article 5 (e) of the contract, of the dividends or savings received on the workmen’s compensation insurance policies. This letter stated:
Examination of your records reveals that a dividend of Workmen’s Compensation Insurance Policy No. WC440969, in amount of $42,940.05, was received by your company during the month of April 1946. The period covered by the dividend was from 8 February 1944 to 8 February 1945.
s|i ijí íJí sfc
It is requested, pursuant to Article 5 (e) of subject contracts, that separate certified checks be submitted to this office for forwarding to the respective contracting agencies. The checks for the Navy’s portion of $12,829.32 and the Army’s portion of $8,433.28 should be drawn pajmble to the Treasurer of the United States *424 and the War Shipping Administration’s portion should be made payable to that agency.
The Government will have a further claim against any dividends or refunds received from Workmen’s Compensation Insurance policies expiring in the years 1946 and 1947. * * *
On April 4, 1947, the defendant’s Resident Cost Inspector wrote plaintiff stating that examination of plaintiff’s records revealed that as of that date insurance dividends totaling $107,198.97 were owed the Government. Further demand was made by the Government on October 29, 1947.
12. On January 26, 1948, plaintiff replied to the defendant’s letters dated April 4 and October 29, 1947, stating in part:
We have carefully considered your request that we pay over to the Navy, Army and WSA certain portions of the dividends which we have received upon our workmen’s compensation insurance and wish to advise that we find no warrant in the master repair contracts for such a request.
Your letters under acknowledgment do not state the basis of your request, but we understand that it is predicated upon the following sentence of Article 5 (e):
If the Contractor, after having been reimbursed, either directly or indirectly, by the Government for for any item of services, material or overhead, subsequently receives any additional sum as a discount, rebate, allowance, credit, salvage or commission in respect of any such item, the Contractor shall promptly pay to the Government an amount equal to one hundred and seven-one hundredths (107/100) of such additional sum.
If that is the basis of your request, the plain and simple answer is that we have never been “reimbursed, directly or indirectly” for the cost of the Insurance upon which the dividends have been paid.
13. On November 2, 1950, the defendant’s Resident Cost Inspector wrote the plaintiff that the Navy Board of Contract Appeals had decided the case of another shipbuilding corporation involving the question of workmen’s compensation insurance dividends, and stated in part:
The Resident Cost Inspector considers NBCA-528 controlling and applicable to insurance claims against *425 the Standard Shipbuilding Corporation and all other contractors and has understood that the Standard Shipbuilding Corporation expected to be guided by the decision. * * * Under the circumstances the Resident Cost Inspector again requests payment of the following amounts determined to be applicable to subject contracts in connection with insurance refunds through the policy year ended 8 February 1946 * * * $107,198.97.
Plaintiff replied on March 12, 1951, stating that auditors had been asked “to make a complete review of the cost records pertaining to the periods during which Master Ship Repair Contracts * * * were in effect * * * because the effect of your November 2, 1950, letter is to reopen the subject of cost allowances under such contracts.”
14. On July 2, 1951, plaintiff’s attorneys wrote to the defendant’s Resident Cost Inspector, asserting that if the defendant were entitled to the claimed $107,198.87 of insurance dividends, plus others which might accrue, then plaintiff was entitled to certain depreciation and salary costs which had been disallowed in the computation of the billing rates established by the supplementary agreements. Plaintiff wrote that allowance of these costs would create a balance in plaintiff’s favor over and above the sum of the insurance dividends. Plaintiff in its letter also stated that it intended to file suit in the Court of Claims for the balance of payments accrued under the contracts, but withheld by the Government against the claim for the insurance dividends. Plaintiff further requested that the Government “consider, as a dispute and as a termination claim under the Contract Settlement Act of 1944, Standard’s contention that your interpretation of Article 5 (e) as aforesaid is incorrect and that the disallowed cost items * * * should be allowed if the Government is to receive credit in respect of the workmen’s compensation insurance dividends received by Standard.”
15. On October 2, 1951, defendant’s Acting Chairman of the Joint Board on ship repair contracts answered the letter from plaintiff’s attorneys, stating in part as follows:
Copies of your letter of 2 July 1951, addressed to the Office of the Navy Cost Inspector, Los Angeles, California, in regard to Master Ship Repair Contracts between your client, the Standard Shipbuilding Corporation, and the Government, have been referred to the *426 Joint Board for transmittal to the appropriate officer or officers pursuant to the request contained in the last paragraph thereof.
The Board is by separate letter forwarding one copy of your letter to each of the cognizant Contracting Officers of the Government Agencies concerned for whatever action deemed appropriate.
You are advised that the Board instructed the Supervisory Cost Inspector, San Francisco, by letter dated 29 June 1951 to process the withheld public vouchers in the aggregate amount of $43,181.13, referred to in your letter, for payment, having the proceeds thereof applied toward the liquidation of this contractor’s indebtedness to the Government for insurance adjustments and unclaimed wages.
On October 9, 1951, plaintiff’s attorneys replied stating that plaintiff had filed its petition in this court on July 23, 1951. No further action was taken by any department or agency of the defendant.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover the stipulated amount of $34,683.37; that the defendant is entitled to recover $89,542.22 on the controverted counterclaim; that it is therefore adjudged and ordered that defendant recover of and from plaintiff the net amount of fifty-four thousand eight hundred and fifty-eight dollars and eighty-five cents ($54,858.85), with interest at the rate of 4 percent per annum from the date of the filing of defendant’s counterclaim, to wit, March 7,1952, to date of payment.

 Webster’s New International Dictionary of the English Language (Second Edition) defines the word “reimburse” as follows on page 2100:
1. Literally, to replace in a purse (an equivalent for that taken, lost, or expended) ; hence, to pay back; repay; 06s., to refund ; as, to reimburse the expenses of a war. 2. To make restoration or payment of equivalent to (a person) ; to indemnify; as, to reimburse one for his losses.